# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (904) 314-9813

Case No. _19. MJ-1341_

)
)
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, Todd Higgins, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

<u>See</u> Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

<u>See</u> Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 846 and 841(a)(1)

The application is based on these facts: <u>See</u> Affidavit in Support of Application for Search Warrant. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the requested warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by HSI. *See* 18 U.S.C. §§ 3122(b), 3123(b).

☒ Delayed notice of _180_ days (give exact ending date if more than 30 days:_ April 21, 2020 _) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Todd Higgins, Task Force Officer, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _10/24/19_

_____
*Judge's signature*

City and State: <u>Milwaukee, Wisconsin</u>

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, DEA Task Force Officer Todd Higgins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (904) 314-9813, with listed subscriber unknown (i.e., **TARGET TELEPHONE-1**), whose wireless communications service provider is AT&T, headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408; and the cellular telephone assigned call number (939) 358-1127, with listed subscriber DAVID QUINONES QUINONES (i.e., **TARGET TELEPHONE-2**), whose wireless communications service provider is Sprint, headquartered at 6480 Sprint Parkway, Overland Park, KS 66251; hereinafter, collectively referred to as the **TARGET TELEPHONES**. The **TARGET TELEPHONES** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am a deputized Federal Task Force Officer ("TFO"), with the United States Department of Justice, Drug Enforcement Administration, currently assigned to DEA Group 68,

at the North Central High Intensity Drug Trafficking Area ("HIDTA"). As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and 21 U.S.C. § 878, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.      I was deputized as a TFO with the DEA in 2018. In addition to being a TFO with the DEA, I have been a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigations ("DCI") since 2014. Prior to my employment for DCI, I was a Detective for the City of Brookfield Police Department and I have been in law enforcement for over 18 years. My responsibilities as a TFO include the investigation of violent crimes, criminal enterprises, violations relating to the illegal sale and transfer of narcotics and firearms, and violent criminal acts in furtherance of criminal enterprises. In addition, my duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. § 841, 843, and 846, and 18 U.S.C. § 1956. I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking. I have also participated in multiple investigations involving illegal drug trafficking by drug trafficking organizations. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their methods for concealing narcotics and narcotics proceeds, and their use of violence and threats of violence to protect their organization. I have received further specialized training concerning the interception of wire and electronic communications.

2

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute cocaine and distribution of cocaine) have been committed, are being committed, or will be committed by Hector Yamil ROGRIGUEZ, David QUINONES-RIOS, First Name Unknown (FNU) Last Name Unknown (LNU) 7, and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## FACTS ESTABLISHING PROBABLE CAUSE

### Background on the Current Investigation

8.     In September 2018, members of North Central High Intensity Drug Trafficking Area Group 63 and Group 68, along with members of Group 62, initiated an investigation into

3

individuals distributing large quantities of cocaine throughout Milwaukee, Wisconsin. HIDTA identified the individuals involved in this cocaine distribution as, among others, Marcos APONTE-LEBRON, Jose Manuel GONZALEZ-COLLADO, Hector Yamil RODRIGUEZ, and Eric ROSA. The investigation revealed that GONZALEZ-COLLADO obtains kilogram-quantities of cocaine from source(s)-of-supply in Puerto Rico. APONTE-LEBRON would facilitate drug shipments from Puerto Rico, retrieve drugs from storage facilities for further distribution by local distributors in Milwaukee, collect drug proceeds, and facilitate the mailing of those proceeds to Puerto Rico. ROSA would, among other things, broker cocaine deals for GONZALEZ-COLLADO in Milwaukee. The investigation disclosed that ROSA would also broker heroin and fentanyl transactions in Milwaukee.

### Drugs and Suspected Drug Proceeds sent via U.S. Mail

9.     During the course of this investigation, the U.S. Postal Service intercepted cocaine-laden parcels originating from Puerto Rico and destined for residences in Milwaukee, Wisconsin on three distinct occasions. First, on September 28, 2018, the USPS intercepted and searched, pursuant to a warrant, a parcel containing approximately three kilograms of cocaine. The parcel originated from Hormigueros, Puerto Rico and was addressed to 1330 S. 22nd Street, Milwaukee, Wisconsin. On October 3, 2018, investigators observed a Honda Civic, registered to GONZALEZ-COLLADO, parked at the residence. On October 4, 2018, investigators executed an anticipatory warrant at 1330 S. 22nd Street, Milwaukee, Wisconsin once the cocaine-laden parcel was received at the residence. During the search, investigators discovered 353.46 grams of cocaine and firearms in the residence's garage. Parked in the alley adjacent to the garage, investigators observed a Toyota 4Runner, which was also registered to GONZALEZ-COLLADO.

4

10.     Second, on October 25, 2018, the USPS intercepted a suspicious parcel addressed to 2166 S. 15th Street, Milwaukee, Wisconsin and again originating from Hormigueros, Puerto Rico.  Although officers attempted to deliver the parcel to the Milwaukee residence on October 29, 2018, no one retrieved it.  A postal employee left a notice in the mailbox directing the parcel's intended recipients to contact the USPS to claim the parcel.  An unidentified male went to the Post Office to give the USPS his contact number in reference to the undelivered parcel. The phone number was affiliated with Jose BURGOS-RIVERA, an identified associate of GONZALEZ-COLLADO.  U.S. Postal Inspector ("USPI") Tyler Fink called the number and spoke to a thick-accented male who agreed to retrieve the parcel.  No one ever retrieved the parcel.  On October 30, 2018, law enforcement searched the parcel pursuant to a warrant and discovered approximately two kilograms of cocaine.

11.     Third, on April 8, 2019, the USPS intercepted a suspicious parcel addressed to 5152 S. 15th Street, Milwaukee, Wisconsin and originating from Mayagüez, Puerto Rico.  The parcel was undeliverable because the destination address did not exist.  On the same date, GONZALEZ-COLLADO went to the West Milwaukee Post Office to specifically inquire about the undelivered parcel.  GONZALEZ-COLLADO gave the postal employee his name – Jose M. Collado – and telephone numbers as a means to contact him should the parcel arrive.  Also on the same date, GONZALEZ-COLLADO left a message with the USPS to inquire about the parcel and left the telephone number (708) 982-6640 as his contact number.  On April 15, 2019, law enforcement searched the parcel pursuant to a warrant and discovered approximately 1.8 kilograms of cocaine.

12.     The investigation also determined that GONZALEZ-COLLADO had sent suspected drug proceeds to Puerto Rico.  On February 19, 2019, location information lawfully-

5

derived from (708) 982-6640 indicated the device was at a U.S. Post Office on the north side of Milwaukee. Video surveillance and still images from the postal facility showed GONZALEZ-COLLADO and an unknown male sending an overnight parcel to Puerto Rico. Suspecting GONZALEZ-COLLADO had mailed drug proceeds, the officers notified HSI and the U.S. Postal Inspection Service in Puerto Rico. On February 22, 2019, location information for (708) 982-6640 indicated the device was again at the postal facility on the north side of Milwaukee. Video surveillance and still images showed GONZALEZ-COLLADO and Roberto SOSA (GONZALEZ-COLLADO's brother in-law) requesting a refund for the overnight parcel sent to Puerto Rico on February 19, 2019. Also on February 22, 2019, U.S. Postal inspectors in Puerto Rico obtained a warrant to search the contents of the suspect parcel. The parcel contained over $72,000 in U.S. currency.

13. On May 23, 2019, USPI Fink reviewed U.S. Postal Service business records and identified a suspicious outbound parcel from Milwaukee, Wisconsin, destined for Mayagüez, Puerto Rico. The suspicious parcel was believed to contain drug proceeds. The parcel had a fictitious sender name and address (i.e. 1234 W. Walker Street, Milwaukee, Wisconsin 53204). Conspicuously, the address of Carlos FIGUEROA-REYES – a known associate of GONZALEZ-COLLADO – is 1233 W. Walker Street, Milwaukee, Wisconsin. USPI Fink noted the consignee address had been used before by other members of the organization on April 9, 2019, and April 20, 2019. On May 24, 2019, USPI Fink reviewed surveillance video at the West Milwaukee Post Office where the suspected money parcel was sent from. A review of surveillance video and still images showed Marcos APONTE-LEBRON enter the Post Office carrying the suspected money parcel and complete the transaction. APONTE-LEBRON paid $14.35 in cash to ship the suspected money parcel.

6

14.     According to U.S Postal records and video surveillance, between May 28, 2019 and July 18, 2019, Hector Yamil RODRIGUEZ appears to have shipped approximately eight parcels containing suspected drug proceeds to various locations in Puerto Rico and to two addresses in Mission, Texas.  Likewise, between May 22, 2019 and August 1, 2019, APONTE-LEBRON appears to have shipped approximately five parcels containing suspected drug proceeds to various locations in Puerto Rico and the same two addresses in Mission, Texas.  Investigators have identified an Internet Protocol ("IP") address that has tracked several of the suspect parcels shipped to and from Puerto Rico and Mission, Texas.  Based on information obtained via subpoena, the IP address tracking these parcels listed a subscriber address of 2730 S. 10th St., Milwaukee, Wisconsin 53215, which is the residence of RODRIGUEZ.

### Intercepted Communications[1] with the TARGET TELEPHONES

15.     On October 4, 2019, Assistant U.S. Attorney Robert J. Brady, Jr. applied for and successfully obtained authorization from U.S. District Judge Lynn Adelman, Eastern District of Wisconsin, to continue intercepting wire and electronic communications (Application Number 13029) for the cellular telephone assigned number (414) 841-3770 (hereinafter CELLULAR TELEPHONE-6) used by Hector Yamil RODRIGUEZ; and for the initial interception of wire communications for the cellular telephone assigned number (787) 463-8963 (hereinafter CELLULAR TELEPHONE-11) used by David QUINONES-RIOS.  The interception of wire and electronic communications on CELLULAR TELEPHONE-6, and the interception of wire communications on CELLULAR TELEPHONE-11, is scheduled to end on November 3, 2019.

---

[1] Most of the intercepted communications referenced in this Affidavit were originally conducted in Spanish.  These communications were translated into English by certified monitors who are fluent in both Spanish and English.  Furthermore, the significance and meaning attributed to those intercepted communications are based on your Affiant's training, experience, and knowledge thus far derived from this investigation.

The Government is pending approval for the authorization to intercept wire and electronic communications for the cellular telephone assigned number (939) 414-0240 (hereinafter CELLULAR TELEPHONE-13), used by FNU LNU 7.

QUINONES-RIOS and FNU LNU 7 discuss distribution of 50-kilogram cocaine shipment

16. On October 5, 2019, at 11:12 a.m., CELLULAR TELEPHONE-11 (i.e., David QUINONES-RIOS) called (939) 414-0240 (i.e., CELLULAR TELEPHONE-13), used by FNU LNU 7. During the intercepted call, QUINONES-RIOS inquired if FNU LNU 7 had illegal drugs available by asking, "Is there work or no?" FNU LNU 7 responded, "I have the same stuff there," indicating he had an available quantity. FNU LNU 7 continued, "I'm going to bring some down. I have to go up there. Some are going to arrive," indicating he would bring QUINONES-RIOS a quantity of illegal drugs that would soon arrive. QUINONES-RIOS inquired when FNU LNU 7's supplier would depart by asking, "When are they leaving?" FNU LNU 7 replied, "Well, I'm waiting for them to tell me, so I can take off tomorrow," indicating he hoped to leave the next day upon receiving word from his supplier. Later in the conversation, FNU LNU 7 said, "Rene is getting 50 from the cousin," and continued, "[h]e told me 20, 20 for me and 30 for him." Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes FNU LNU 7 expected to receive 20 kilograms of cocaine from a person named "Rene," who would retain 30 kilograms of cocaine.

QUINONES-RIOS and FNU LNU 7 discuss individuals
reneging on drug deal involving Colombian

17. On October 7, 2019, at 9:50 a.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) called CELLULAR TELEPHONE-13 (i.e., FNU LNU 7). During the intercepted call, FNU LNU 7 said, "Hey, I called . . . these people are about to back out,"

8

indicating that certain individuals were about to renege on a deal. FNU LNU 7 then commented, "I sent a message to the 'Colom,' to the guy's father," indicating he contacted a Colombian male regarding the potentially lost deal. QUINONES-RIOS asked, "What did you tell him?" FNU LNU 7 said, "I told him, 'Good morning, these people are about to back out because they see that it's too much waiting and waiting. They don't like it. [They] think there is something weird there," indicating the people with whom FNU LNU 7 was dealing were becoming impatient with the Colombian. Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes FNU LNU 7 was recounting how drug-trafficking associates were becoming frustrated with the delays of a Colombian drug source.

<u>QUINONES-RIOS discusses Milwaukee-bound cocaine shipment<br>with RODRIGUEZ and FNU LNU 7</u>

18.     On October 6, 2019, at 8:07 p.m., CELLULAR TELEPHONE-6 (i.e., Hector Yamil RODRIGUEZ) received a call from (904) 314-9813 (i.e., **TARGET TELEPHONE-1**), used by QUINONES-RIOS.[2] During the intercepted call, RODRIGUEZ asked, "How much are you going to send?" QUINONES-RIOS inquired, "[I]f I have four, will you take four?" RODRIGUEZ replied, "Yes, of course blood, you know." Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes QUINONES-RIOS, who is in Puerto Rico, offered to mail four kilograms of cocaine to RODRIGUEZ in Milwaukee, Wisconsin.

---

[2] Spanish-speaking monitors concluded QUINONES-RIOS was the user of **TARGET TELEPHONE-1** based on a voice comparison with the user of CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS).

Case 2:19-mj-01341-WED   Filed 10/24/19   Page 10 of 22   Document 1

19.    On October 6, 2019, at 8:22 p.m., CELLULAR TELEPHONE-6 (i.e., RODRIGUEZ) received a call from **TARGET TELEPHONE-1** (i.e., QUINONES-RIOS). During the intercepted call, QUINONES-RIOS said, "28½," indicating his price for a kilogram of cocaine was $28,500. RODRIGUEZ replied, "Man, do 28, if I'm getting it for 27½ from these assholes," indicating he wanted QUINONES-RIOS to drop the price to $28,000 per kilogram. QUINONES-RIOS inquired "28?" RODRIGUEZ replied, "Yes, 28." QUINONES-RIOS responded, "Alright then," indicating he agreed to sell RODRIGUEZ cocaine at $28,000 per kilogram.

20.    On October 7, 2019, at 8:02 p.m., CELLULAR TELEPHONE-13 (i.e., FNU LNU 7) called CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS). During the intercepted call, FNU LNU 7 inquired if anyone wanted illegal drugs by asking, "Does anyone want parts?" QUINONES-RIOS replied, "Nobody had told me anything. I sold three a little while ago," indicating he sold three kilograms of cocaine. FNU LNU 7 subsequently remarked, "I have three there in the house," indicating he had three kilograms of cocaine available at a residence. QUINONES-RIOS asked, "What stamp?" Based on my training and experience, and the information thus far obtained in this investigation, your Affiant knows that drug-trafficking organizations often stamp or place markings on their illicit goods, like cocaine, to identify them as belonging to that particular organization and thereby facilitating the organization's receipt of the proceeds from the sale of those illicit goods.[3] FNU LNU 7 replied, "C-1," indicating the

---

[3] As detailed *supra*, investigators seized three bricks of cocaine (totaling approximately 3 kilograms) on September 28, 2018 that were addressed to 1330 S. 22nd Street, Milwaukee, Wisconsin and originating from Hormigueros, Puerto Rico. Each brick had a distinctive marking – "CR7," "H," and the image of a turtle, respectively. On February 22, 2015, Customs and Border Protection seized 90 bricks of cocaine concealed on a cargo ship in Puerto Rico. The cocaine bricks had markings, including "CR7."

10

cocaine bore the symbol "C-1." QUINONES-RIOS asked, "How many?" FNU LNU 7 replied, "I can give them to you for . . . you can get six [. . . .]," indicating he could supply QUINONES-RIOS with up to six kilograms of cocaine. QUINONES-RIOS responded, "I have about three or four sold tomorrow," indicating he had already arranged the sale of three to four kilograms of cocaine. FNU LNU 7 inquired if QUINONES-RIOS needed to mail any cocaine by asking, "And does anyone want any out there?" QUINONES-RIOS replied, "For out there, I sent four today as well," indicating he had mailed four kilograms of cocaine to RODRIGUEZ that day. FNU LNU 7 remarked, "I was going to release you one to send it out there." QUINONES-RIOS said, "I have a guy there that grabs some. I'll tell him tomorrow." FNU LNU 7 said, "Find out." QUINONES-RIOS asked, "Alright, how much should we charge him for it?" FNU LNU 7 inquired, "How much do you give it to him for?" QUINONES-RIOS said, "I charge him 28," indicating he charged RODRIGUEZ $28,000 per kilogram of cocaine. FNU LNU 7 said, "Whatever you can sell it for."

21.    On October 9, 2019, at 3:18 p.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) called CELLULAR TELEPHONE-13 (i.e., FNU LNU 7). During the intercepted call, QUINONES-RIOS said, "I sent four and two arrived and it has not arrived," indicating he had mailed RODRIGUEZ four kilograms of cocaine, but only two kilograms had arrived at that point. FNU LNU 7 said, "The mailmen are stealing it, fucker." QUINONES-RIOS noted, "[T]here was two in one box and two in the other," indicating he had mailed two boxes that each contained two kilograms of cocaine. FNU LNU 7 tried to reassure QUINONES-RIOS by saying, "Well, it arrived." QUINONES-RIOS said, "One arrived and the other is still

11

missing," indicating only one of two cocaine-laden boxes arrived in Milwaukee.[4] FNU LNU 7 said, "When that thing arrives, if it arrives . . . leave it like that; this is mine, I'm the one to suffer the embarrassment and have done all of the scrambling," indicating he would be responsible for the loss. QUINONES-RIOS inquired if FNU LNU 7 would need to pay his supplier for the lost cocaine by asking, "You have to pay the guy, right?" FNU LNU 7 replied, "Yes, when the guy calls." QUINONES-RIOS asked, "But who called you, a Dominican?" FNU LNU 7 replied, "The big guy called me . . . . a number from Colombia," suggesting his cocaine source was in Colombia. QUINONES-RIOS asked, "What did he say?" FNU LNU 7 said, "He put the Dominican on the phone to talk, and I said, 'Look, we will talk later, because I'm meeting with these people at 4:30, so you guys can talk.' [The Dominican said,] 'No, that we need for the gas, but everything is ready.' I told him to call [unintelligible], I'm not in charge of that," indicating he had discussed an impending cocaine shipment with a Dominican individual.

<u>QUINONES-RIOS and FNU LNU 7 discuss drug debt owed by "Freddie"</u>

22.     On October 21, 2019, at 8:34 p.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) called (939) 358-1127 (i.e., **TARGET TELEPHONE-2**), used by FNU

---

[4] Contemporaneous intercepted calls disclosed that the two suspected cocaine-laden parcels were mailed to RODRIGUEZ in Milwaukee, Wisconsin. On October 9, 2018, at 11:22 a.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) received a call from (787) 675-0225, used by someone identified as "Edward." During the intercepted call, QUINONES-RIOS said, "A box of 2 got lost." Later in the conversation, QUINONES-RIOS said, "[I]t (i.e., the box) is over there in Milwaukee already." On the same date, at 2:50 p.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) received a call from (954) 560-1299, used by Karina FERRER. During the intercepted call, QUINONES-RIOS said, "The fucking box arrived and it arrived somewhere else. There were two more in another box; that's $80,000 lost." On the same date, at 4:00 p.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) received a call from (787) 240-6515, used by an individual nicknamed "Peluca." During the intercepted call, QUINONES-RIOS said, "One is missing. Supposedly, Yamil (i.e., RODRIGUEZ) called over there (i.e., the Post Office), and I was listening, and they told him that it (i.e., the box) will be delivered tomorrow or the following day."

LNU 7.[5]  During the intercepted call, FNU LNU 7 said, "[Freddie] owed me, he owed me ten-thousand dollars [unintelligible] because I had sent it to him," indicating a person named "Freddie" owed $10,000 for a quantity of drugs supplied by FNU LNU 7.  FNU LNU 7 continued, "I had sent it (i.e., illegal drugs) to him, he told me, 'Send me another one (i.e., another quantity of illegal drugs).'  What I had there, I sent it to him."  QUINONES-RIOS responded, "Damn."  FNU LNU 7 said, "He has to pay them.  He sold them.  He sold them," indicating "Freddie" must pay the drug debt because he has the proceeds from the sale of the illegal drugs.  Later in the conversation, QUINONES-RIOS commented, "He always does the same thing, he scammed Carlos and he never paid him the money," indicating "Freddie" also failed to pay another supplier named Carlos.  FNU LNU 7 agreed by saying, "Yes, that's how he is."  QUINONES-RIOS inquired if FNU LNU 7 still owed money to his drug supplier by asking, "So, now you have to pay that?"  FNU LNU 7 replied, "No, I don't owe that; that was mine," indicating he already satisfied the debt to his supplier.  QUINONES-RIOS commented, "Okay, but still, it is losses.  He has to give you that money."

QUINONES-RIOS and FNU LNU 7 discuss pending 100-kilogram cocaine shipment

23.     On October 23, 2019, at 10:34 a.m., CELLULAR TELEPHONE-11 (i.e., QUINONES-RIOS) called CELLULAR TELEPHONE-13 (i.e., FNU LNU 7).  During the intercepted call, QUINONES-RIOS asked, "Were they able to leave?"  FNU LNU 7 replied, "No, not yet."  QUINONES-RIOS said, "Gordo told me they were supposedly leaving today," indicating an impending shipment of illegal drugs would be shipped that day.  FNU LNU 7 said, "No, they are leaving tonight, Davo; that's early in the morning," indicating the shipment of

---

[5]  Spanish-speaking monitors concluded FNU LNU 7 was the user of **TARGET TELEPHONE-2** based on a voice comparison with the user of CELLULAR TELEPHONE-13 (i.e., FNU LNU 7).

13

illegal drugs would arrive early the next day. QUINONES-RIOS said, "Okay, I didn't know. All set then." Later in the same conversation, FNU LNU 7 said, "Be on the lookout tomorrow . . . [w]hen I call you to tell you to get somewhere, you get there. I have everything planned in my head." FNU LNU 7 continued, "Take them out from a place to a car . . . because from where I'm going to be is close over there by Vilmari's house." QUINONES-RIOS asked, "But, how many are there? A hundred and some?" FNU LNU 7 said, "100!" QUINONES-RIOS responded, "Alright, if there are 100, uh, that's heavy." FNU LNU 7 said, "Yeah." QUINONES-RIOS continued, "That's heavy. It has to be split fifty-fifty. Fifty in Gordo's and fifty in another one. I'll take the white truck or I'll take the Accord because the Acura is new. Well, I also have another truck there too." Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes QUINONES-RIOS and FNU LNU 7 were awaiting a shipment of 100 kilograms of cocaine, which they subsequently intended to transport in two vehicles, i.e., 50 kilograms in a vehicle belonging to QUINONES-RIOS and 50 kilograms in a vehicle belonging to an associate nicknamed "Gordo."

24.     Given that QUINONES-RIOS and FNU LNU 7, like most contemporary cell phone users, likely possesses, or has in close proximity, their cellular telephones nearly everywhere they go, location information for the **TARGET TELEPHONES**, such as E-911 Phase II data, GPS data, and latitude-longitude data, will assist law enforcement in more precisely ascertaining their movements. By more precisely ascertaining QUINONES-RIOS and FNU LNU 7's movements, law enforcement officers will be better able to divine patterns from those movements, ascertain periods of heightened activity, and thereby more effectively conduct physical surveillance. As a result, law enforcement officers will be better able to, among other things, discern their drug distribution routes, identify confederates involved in the distribution of

14

controlled substances, and identify locations where those controlled substances, and proceeds from the sale of those controlled substances, may be concealed.

25. Law enforcement subpoenaed the subscriber information for the **TARGET TELEPHONE-1** which revealed the following information:

- Subscriber: unknown

- Account Established Date: August 19, 2019

- Account Type: AT&T

26. Law enforcement subpoenaed the subscriber information for the **TARGET TELEPHONE-2** which revealed the following information:

- Subscriber: DAVID QUINONES QUINONES

- Account Established Date: February 19, 2019

- Account Type: Sprint

27. In my training and experience, I have learned that AT&T and Sprint are companies that provide cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

15

connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

28. Based on my training and experience, I know that AT&T and Sprint can collect E-911 Phase II data about the location of the **TARGET TELEPHONES**, including by initiating a signal to determine the location of the **TARGET TELEPHONES** on their respective networks or with such other reference points as may be reasonably available.

29. Based on my training and experience, I know that AT&T and Sprint can collect cell-site data on a prospective basis about the **TARGET TELEPHONES**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers, such as AT&T and Sprint, typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## **AUTHORIZATION REQUEST**

30. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or

16

capture certain information in Attachment A for each communication to or from the **TARGET TELEPHONES**, without geographic limit, for a period of forty-five days (45) days pursuant to 18 U.S.C. § 3123(c)(1).

31.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the **TARGET TELEPHONES** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

32.     I further request that the Court direct AT&T and Sprint disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T and Sprint. I also request that the Court direct AT&T and Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T and Sprint's services, including by initiating a signal to determine the

17

location of the **TARGET TELEPHONES** on their respective networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T and Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

33.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONES** outside of daytime hours.

34.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

18

## ATTACHMENT A

### Property to Be Searched

1.    The cellular telephone assigned call number (904) 314-9813, with listed subscriber unknown (i.e., **TARGET TELEPHONE-1**), whose wireless communications service provider is AT&T, headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2.    Records and information associated with **TARGET TELEPHONE-1** that is within the possession, custody, or control of AT&T, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of **TARGET TELEPHONE-1** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of **TARGET TELEPHONE-1** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of **TARGET TELEPHONE-1** on AT&T's network, or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

2

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute a controlled substance and distribution of a controlled substance) involving David QUINONES-RIOS, FNU LNU 7, and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3